UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MICHAEL S.,[1]

        Plaintiff,

    v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

Case No. 19-cv-814-JPG

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and a period of disability pursuant to 42 U.S.C. §§ 416(i) and 423.

## Procedural History

Plaintiff applied for benefits in March 2016 alleging disability beginning July 1, 2015. After holding an evidentiary hearing in April 2018, ALJ Jason Panek denied the application in a written decision dated July 19, 2018.  (Tr. 41-51.)  After considering additional evidence, the Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1-4.)  Plaintiff exhausted his administrative remedies and filed a timely complaint in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

- The ALJ erred in failing to adequately explain the finding that plaintiff did not meet or exceed Listing 1.04.
- The ALJ erred in discounting the medical opinion of plaintiff's treating physician.
- The ALJ erred in evaluating plaintiff's subjective symptoms.

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order to protect the plaintiff's privacy.  *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

- The ALJ erred in failing to apply Grid Rule 202.06.
- The ALJ erred in failing to recognize and address obvious conflicts between the testimony of the vocational expert (VE) and the Dictionary of Occupational Titles (DOT).

### **Applicable Legal Standards**

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but that the impairment is neither listed in nor equivalent to the impairments in the regulations— failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant

is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience.  If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id*.; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited:  while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable person would find sufficient to support a decision.  *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).   The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).  But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner.  *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## The Decision of the ALJ

ALJ Panek followed the five-step analytical framework described above.  He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date and that he is insured for DIB through December 31, 2020.  The ALJ found that plaintiff had severe impairments of osteoarthritis of the thoracic and cervical spines and knees, stenosis of the cervical spine, obstructive sleep apnea, hypertension, and obesity, but that these severe impairments did not meet or equal a listed impairment.  The ALJ rejected the notion that plaintiff suffered from peripheral neuropathy in his hands and feet because there were no consistent clinical findings or

persistent symptomatic complaints despite plaintiff's treating physician's statement in support.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform light work as long as there was no climbing ladders, ropes or scaffolds; only occasional climbing ramps and stairs, stooping, kneeling, crouching and crawling; no concentrated exposure to hazards, unprotected heights, vibration, and temperature extremes; and only occasional reaching, handling, fingering, and feeling with the left upper extremity and frequent handling, fingering, and feeling with the right upper extremity.  Based on the VE's testimony, the ALJ found that plaintiff could not do his past relevant work but that, given his age, education, work experience, and RFC, he was able to do other jobs which exist in significant numbers in the local and national economies.  Thus, the ALJ found plaintiff was not disabled.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the point raised by plaintiff and is confined to the relevant time period.

### 1.    Agency Forms

Plaintiff was born in December 1964 and was 50 years old at his alleged onset date of July 1, 2015.  He was last insured for DIB on December 31, 2020.  (Tr. 204.)  He had worked as a truck driver and a detailer in a body shop.  He had obtained his GED.  (Tr. 208-09.)

In his June 9, 2016, self-reported Function Report, plaintiff stated his conditions caused pain, and the narcotics he took to control the pain caused dizziness, drowsiness, and an inability to drive or do a lot of physical jobs that required lifting.  (Tr. 216.)  He described his daily activities as getting up, brushing his teeth, showering, preparing an easy small breakfast, feeding the pets, doing minor repairs, tinkering around the house, watching TV, eating lunch, doing laundry and

dishes, browsing the internet, taking naps, eating dinner, watching a movie, then going back to bed.  His wife helped him with caring for the pets.  He could no longer drive a truck, which required a commercial driver's license.  His sleep was disrupted by sleep apnea and pain from spinal stenosis and osteoarthritis.  He experienced stiffness and pain when he would bend over while getting dressed.  (Tr. 217.)

He was able to prepare simple meals like frozen meals, sandwiches, and soups on a daily basis.  He was able to do light laundry and light cleaning for an hour or two on a weekly basis.  He did not do other housework or yardwork because it caused too much pain, caused his arms to go numb, and decreased the sensation in his feet and legs.  (Tr. 218.)  He was able to go outside daily alone and was able to walk, drive a car but not for long distances, and ride in a car.  He was able to go grocery shopping biweekly for approximately 45 minutes and manage financial tasks.  (Tr. 219.)

He could read and watch TV but he would fall asleep after an hour.  He would also work on old cars for short periods but he had to take breaks to rest, because of pain, and because reduced manual dexterity and range of motion made it hard to do intricate repairs.  (Tr. 220.)  He reported limits on numerous physical abilities, although he reported he could walk 600-800 feet before needing to take a break and used a cane to walk to the mailbox.  (Tr. 221-22.)

### 2.    Evidentiary Hearing

On April 19, 2018, plaintiff appeared and testified at a hearing before ALJ Panek.  He was represented by an attorney.  (Tr. 59.)

Plaintiff testified that he lived with his wife and son.  He had a driver's license with no medical restrictions and was still able to drive but only did so a couple of times a month because of the effects of his medication.  He had obtained his GED.  (Tr. 63-64.)

He had not worked since July 2015 when he was employed as a truck driver, but at that time he failed to pass the Department of Transportation physical exam.  He attributed the failure to his blood pressure, narcotic medications, and spinal problems.  (Tr. 64.)  He testified that he could not return to work as a truck driver or body shop worker because of neuropathy, fatigue/sleepiness, and back pain that required him to alternate sitting and standing about every hour and to take a 15- to 20-minute break to rest about every hour.  He was able to sleep only three or four hours a night because of pain and was sleepy during the daytime because of sleep apnea and his medications.  He would nap during the day three or four days a week.  (Tr. 65-69.)  He was only comfortable lifting ten pounds or less and was not able to twist a whole lot.  Additionally, he would have trouble concentrating for more than about an hour on his feet without taking a break to move around.  (Tr. 83.)

Plaintiff testified that his pain was primarily in the neck and between the shoulder blades but occasionally jumped to the lower back when he would bend over a lot.  (Tr. 72.)  Plaintiff testified that he took ten to twelve Percocet pills every day for pain as prescribed, including to treat breakthrough pain.  The Percocet was effective to bring down the breakthrough pain but his pain level was usually about seven on a scale of one to ten and would increase to eight or nine when he was up and around for more than an hour.  The pain would increase when he bent over.  The only time he did not have any pain was when he was asleep.  (Tr. 66, 69-70.)  Plaintiff testified that he had not had any surgery, injections, or physical therapy to help with the pain, and that a couple of visits to a chiropractor in December 2016 had not helped.  He testified that his doctor recommended putting off surgery as long as possible.  (Tr. 71.)  He could not perform some activities.  One or two days a week he could not do anything other than lay down because of the pain.  (Tr. 81-82.)  He had trouble putting socks on because it required him to bend over.  (Tr. 84.)

Plaintiff also testified that more recently the tingling, numbness and some pain in his hands had gotten worse and has made it difficult to use his hands or to work while reaching over his head. (Tr. 72-74.)  He was unable to work on his car for the year before the hearing and had difficulty using a smartphone, writing, and other things that require manipulation of small things, but he was able to brush his teeth.  (Tr. 75-76.)  He was beginning to experience neuropathy in his feet as well, which affected his balance and coordination and his ability to squat or kneel repeatedly.  (Tr. 81-82.)

Plaintiff testified that his hypertension was not under control and he was trying to find an effective medication with acceptable side effects.  (Tr. 76-78.)

In a typical day, he would wake up between 3:30 and 4:00 a.m. and then go to sleep on the couch for an hour or two.  He would get up for the day around 6:00 or 7:00 a.m.  During the day, he would watch television and help with the household chores like laundry, washing dishes, cooking meals, and vacuuming, as long as he didn't overdo it.  He would take a break about every thirty minutes.  He did not go out to socialize a lot.  (Tr. 78-80.)

Holly Berquist Neal testified as a VE.  (Tr. 84-85.)  She testified that, given the restrictions of the RFC found by the ALJ—light work with exertional, nonexertional, and environmental restrictions—plaintiff could not perform his past work but could perform jobs that existed in significant numbers in the national economy, namely, counter clerk, furniture rental clerk, and usher.  (Tr. 86, 87.)  Adding the additional criteria of being off-task 20% of the day because of needing breaks, or missing three days of work per month, no jobs existed in significant numbers in the national economy.  (Tr. 88-89.)

### 3.    Medical Records

Plaintiff has a history of neck, back, and joint pain for which he sought treatment from Dr.

Michael S. McNear, M.D., his primary care physician since March 2000.  On February 1, 2013, an MRI of the cervical spine showed generalized moderate to severe degenerative changes of the cervical spine, including mild to moderate disc bulging and facet hypertrophy.[2]  (Tr. 341.)  On February 4, 2013, an MRI of the thoracic spine showed a small central disc protrusion at T7-T8 with mild impingement on the cord centrally.  (Tr. 342.)

Plaintiff saw Dr. McNear on July 30, 2014, February 4, 2015, and August 19, 2015 (Tr. 310, 313, & 318.)  In all of these visits, Dr. McNear noted that plaintiff suffered from the impairments or related impairments that the ALJ found to be serious.  However, Dr. McNear noted that the plaintiff's reason for these visits was for a 6-month check-up and that the plaintiff had no new complaints.  He also regularly noted that plaintiff's pain was controlled and stable on his current pain medication, which he was tolerating without a problem, and had not changed in quality or severity.  Dr. McNear repeatedly advised plaintiff to continue his current medications and treatment plan.  (Tr. 310-20.)

In February 2016, plaintiff failed the Department of Transportation physical exam and saw Dr. McNear to follow up on February 10, 2016.  Dr. McNear added to his assessment cervical spine stenosis.[3]  (Tr. 308.)  Again, Dr. McNair noted that plaintiff's pain was controlled and stable on his current pain medication (Hydrocodone-Acetaminophen and Percocet), which he was tolerating without problem, and had not changed in quality or severity.  (Tr. 306.)  Dr. McNair advised him to continue his current medications and treatment plan.  (Tr. 309.)

---

[2] Facet hypertrophy is essentially arthritis in joints at the surfaces of bones in the spine.  *See* Facet, *Dorland's Illustrated Medical Dictionary* 668 & 158 (32d ed. 2012).

[3] Spinal stenosis is defined as a "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space." Spinal Stenosis, *Dorland's Medical Dictionary*, https://www.dorlands.com/dorlands/def. jsp?id=100100588 (visited Jan. 22, 2021).

On May 11, 2016, plaintiff saw Jacqueline Baalman, FNP-PC where his chief complaint was that he needed his disability papers filled out.  In her notes, Nurse Baalman assessed plaintiff as having cervical spine stenosis.  (Tr. 360-63.)  She completed a Medical Source Statement in which she reported that because of plaintiff's spinal stenosis, other spinal problems, and other health conditions, he had restrictions on lifting/carrying; sitting/standing/walking; use of hands and feet; nonexertional activities; and environmental limitations.  (Tr. 334-40.)  There are no indications in the record that Nurse Baalman ever saw plaintiff other than for this visit.

On July 21, 2016, plaintiff saw state agency physician Raymond Leung, M.D., an internist, for a consultative medical examination.  Plaintiff reported that he did not use a cane or walker, that he was able to walk 2 blocks, that he could lift up to 20 pounds, and that his pain medications (Oxycodone and Hydrocodone) helped.  Dr. Leung observed that plaintiff was able to pick up a penny from the table with both hands fairly well, and his gait was within normal limits.  He was able to walk 50 feet unassisted, to tandem walk, hop, heel walk, toe walk, and squat.  Straight leg raising was 40 degrees and 30 degrees with the left and right legs, respectively.  Plaintiff had decreased range of motion in the cervical spine, lumbar spine, and knees.  Pinch, arm, leg, and grip strength were 4+/5 throughout and there was no muscle atrophy.  He had no difficulty getting on and off the exam table.  Dr. Leung's impressions included that plaintiff had osteoarthritis, spinal stenosis, herniated discs, decreased range of motion in the cervical spine, lumbar spine and both knees and that plaintiff's gait was within normal limits.  (Tr. 344-46.)

Plaintiff saw Dr. McNear again on August 3, 2016, where his blood pressure was his chief complaint but also complained of pain from his right lower back and down his upper leg, including his knee.  Dr. McNair noted pain and stiffness in localized in one or more joints.  He again noted that plaintiff's pain was controlled and stable on his current pain medication (Hydrocodone-

Acetaminophen and Percocet), which he was tolerating without problem, and had not changed in quality or severity. Plaintiff's right knee appeared normal with no swelling and with full range of motion. Dr. McNair advised him to continue his current medications and treatment plan. (Tr. 356-59.)

On September 21, 2016, plaintiff saw Dr. McNair for a check-up where his chief complaint was his blood pressure. The records do not indicate plaintiff raised the issue of his pain or spinal problems, and Dr. McNear advised him to continue his current medications and treatment plan. (Tr. 402-04.)[4]

On December 12, 2016, plaintiff visited Blake Dugger, D.C. for moderate to severe pain. Plaintiff reported constant pain in his neck and upper back that radiated to his shoulders, arms, and hands. The pain was a 7 out of 10, which increased with certain movements and activities of daily living and decreased with pain medication. Dr. Dugger noted that plaintiff's ambulation and gait were normal but that he suffered from spinal compression and reduced range of motion. Three days later, on December 15, 2016, plaintiff reported a decrease in intensity, but not frequency, of pain—6 out of 10—after chiropractic treatment on his initial visit. Dr. Dugger also noted objective findings of reduction in other severe symptoms. (Tr. 406-09.)

On February 8, 2017, plaintiff saw Dr. McNair for a check-up and blood work. Again, plaintiff had no new complaints, and his pain was controlled and stable on his current pain medication (Hydrocodone-Acetaminophen and Percocet), which he was tolerating without problem, and had not changed in quality or severity. Dr. McNair advised him to continue his current medications and treatment plan. (Tr. 398-401.)

---

[4] Plaintiff refers to an October 15, 2016, visit with Dr. McNear in his brief, but there are no records of such a visit at the transcript pages cited, and the Court has not located such records any other place in the transcript.

Plaintiff saw Dr. McNear again on June 14, 2017, where his chief complaint was that he needed a check-up and lab work.  Dr. McNear noted that plaintiff was having adverse side effects from his pain medication (Oxycodone) and suffered painful and stiff joints.  Dr. McNear added localized primary osteoarthritis of thoracic vertebrae to his assessment of plaintiff.  He advised plaintiff to switch his pain medication to Percocet.  (Tr. 395-97.)

On October 4, 2017, Dr. McNear completed a number of medical source statements (MSS). He notes in the Cervical Spine MSS diagnoses of spinal stenosis and degenerative disc disease with chronic pain and poor prognosis.  Dr. McNear noted tenderness, crepitus, muscle spasm, muscle weakness, chronic fatigue, impaired sleep, lack of coordination, dropping things and reduced grip strength.  He further noted limited cervical range of motion and drowsiness caused by pain medication.  He opined that plaintiff was limited in his sitting and standing and needed to be able so shift position at will and walk around for 15 minutes about every half-hour during the workday as well as take unscheduled 15-minute breaks about every hour to lie down or rest.  He also listed lifting, nonexertional, and reaching/handling/fingering limitations and stated that plaintiff would likely miss more than 4 days of work per month and be off-task at least 25% of time. (Tr. 366-70.)

In the Spinal Nerve Root Compression MSS, Dr. McNear stated that plaintiff's nerve compression at T7-T8 and C5-C6 was caused by disc protrusion/bulging, spinal stenosis, degenerative disc disease, and osteoarthritis.  He stated that plaintiff's symptoms of pain, weakness, tingling, burning, and weakness limited plaintiff in the ways similar to the cervical spine statement except that he was likely to miss 10 days of work per month.  (Tr. 377-79.)  Other MSSs completed by Dr. McNair indicated plaintiff's medication was partially effective to treat his pain but that the pain was getting worse (Tr. 381-83); he suffered 4 to 6 sleep attacks per day, each

lasting 15 to 30 minutes, that would require environmental restrictions (Tr. 385-88.); and he suffered peripheral neuropathy that caused pain in his arms (Tr. 390-93). Dr. McNear opined that these conditions required similar limitations on plaintiff's abilities to work.

Following the hearing before the ALJ, plaintiff had a number of additional tests. He had two more studies of the cervical spine, on June 6 and August 29, 2018, respectively. The June 6 MRI showed mild disc space narrowing at multiple levels and increased T2 signal in cervical cord at level C5-C6 consistent with myelomalacia or cord contusion. (Tr. 32-33.) The August 29 CT scan showed moderate to severe degenerative changes leading to moderate to severe central canal stenosis. (Tr. 34-35.) Plaintiff also had x-rays of his cervical spine on June 6 and August 17, 2018. The June 6 x-ray showed mild or mild to moderate degenerative disc disease at multiple levels, but no acute findings. (Tr. 37.) The August 17 x-ray showed multisegment cervical degenerative disc disease with moderate central canal stenosis at C5-C6. (Tr. 36.)

On August 29, 2018, plaintiff saw Lukas Peter Zebala, M.D., an orthopedist, who diagnosed him with cervical spondylolysis, cervical stenosis, cervical radiculopathy, and cervical myelopathy, and who recommended surgery. (Tr. 20.)

### 4.    State Agency Reviewing Physicians

On August 3, 2016, state agency reviewing physician Julio Pardo, M.D., initially reviewed plaintiff's medical records and specifically noted state agency consulting physician Dr. Leung's observations. Dr. Pardo considered but found that plaintiff did not meet or equal Listing 1.04 after consideration of plaintiff's activities of daily living. He further found, that although plaintiff was impaired, his activities of daily living demonstrated that his impairments did not restrict him as much as Nurse Baalman stated they did, and that plaintiff was capable of light work with exertional and nonexertional restrictions. Specifically, Dr. Pardo found plaintiff could occasionally lift 20

pounds and frequently list 10 pounds; could stand and/or walk for a total of 6 hours and could sit

for a total of 6 hours in an 8-hour day; could occasionally climb ramps, stairs, ladders, ropes or

scaffolds; occasionally could stoop and crouch; and must avoid concentrated exposure to hazards.

(Tr. 92-101.)  On September 23, 2016, Calixto Aquino, M.D. came to the same conclusions on

reconsideration, specifically noting Dr. McNear's observations from August 3, 2016.  (Tr. 103-

13.)

## **Analysis**

### 1.    **Listing 1.04**

Plaintiff first complains that, at Step 3, the ALJ failed to adequately explain the finding

that plaintiff did not meet or equal Listing 1.04, the listing for disorders of the spine—specifically,

Listing 1.04A.  A finding that a claimant's condition meets or equals a listed impairment is a

finding that the claimant is presumptively disabled.  "To meet or equal a listed impairment, the

claimant must satisfy all of the criteria of the listed impairment."  *Maggard v. Apfel*, 167 F.3d 376,

380 (7th Cir. 1999).  Plaintiff bears the burden of proving that he meets or equals all of those

criteria.  *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).  An impairment "cannot meet the

criteria of a listing based only on a diagnosis."  20 C.F.R. § 404.1525(d).

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ

must discuss the listing by name and offer more than perfunctory analysis of the listing."  *Barnett*

*v. Barnhart,* 381 F.3d 664, 668 (7th Cir. 2004); *accord Jeske v. Saul*, 955 F.3d 583, 588 (7th Cir.

2020).  The ALJ's decision must be read as a whole, and an adequate discussion of the claimant's

impairments, the objective medical evidence, and the claimant's credibility elsewhere in the

decision—for example, in connection with an RFC finding—can be sufficient to support a Step 3

finding that a claimant does not meet or equal a listing.  *Zellweger v. Saul*, 984 F.3d 1251, 1252,

1254 (7th Cir. 2021); *Jeske*, 955 F.3d at 590; *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015)

(citing *Rice v. Barnhart,* 384 F.3d 363, 370 n. 5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's

decision as a whole, and . . . it would be a needless formality to have the ALJ repeat substantially

similar factual analyses at both steps three and five")).

As of the date of ALJ Panek's decision,[5] the relevant part of that listing provided:

1.04  Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:

A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

* * *

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.04.  Thus, if a claimant has documented instances of one

or more spinal disorders that satisfy Listing 1.04A, he will be found disabled at Step 3.

Plaintiff faults the ALJ for failing to mention Listing 1.04A specifically or to adequately

explain which requirements in that subsection were not satisfied, resulting in nothing more than a

perfunctory analysis.  Consequently, plaintiff argues that the Court cannot be sure the ALJ even

considered that listing.  Specifically, he argues that the medical records provide evidence of all

four criteria:  the 2013 and 2016 MRIs noting various spinal changes; Nurse Baalman's May 2016

---

[5] In evaluating a plaintiff's statements about his symptoms, the Court applies the rules that were in place at the time of the ALJ's decision.  *Burmester v. Berryhill*, 920 F.3d 507, 510 n. 1 (7th Cir. 2019) (citing SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49463, 49463-64, 2017 WL 4790249 (Oct. 25, 2017)).  In this case, that would be the rule in effect on July 19, 2018—SSR 16-3p, 81 Fed. Reg. 14166-01, 2016 WL 1119029 (Mar. 16, 2016), which became effective March 28, 2016, and which was modified in immaterial ways on October 25, 2017, 82 Fed. Reg. 49462-03, 2017 WL 4790249 (Oct. 25, 2017).

note about plaintiff's walking limitations; Dr. Leung's 2016 records reflecting decreased range of motion in the cervical and lumbar spine and in both knees and positive straight leg-raising tests; and other medical records.

The Commissioner argues that the ALJ's conclusion that plaintiff failed to demonstrate he met or medically equaled Listing 1.04A was supported by substantial evidence. The Commissioner notes that, while the ALJ's initial discussion of the general listing was brief and does not discuss each requirement of the listing separately, consideration of the relevant issues continued into discussions elsewhere in the decision, including the discussion of plaintiff's RFC. The Commissioner further argues that plaintiff pointed to no evidence of "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss," the third criteria of Listing 1.04A. The Commissioners concludes that, in light of the agency reviewing physician's expert opinions that plaintiff did not meet Listing 1.04, the ALJ had substantial evidence to come to the same conclusion.

It is true that ALJ Panek did not specifically refer to Listing 1.04*A*, instead referring only generally to Listing 1.04, and in that sentence rejected it in a cursory fashion as a basis for disability. (Tr. 44.) However, he gave more than a perfunctory analysis of the criteria in Listing 1.04A, as well as plaintiff's impairments, their frequency and severity, and their impact on his life in the discussion at Steps 2 and 4 of his analysis. For example, the ALJ specifically considered in his Step 2 analysis whether there was credible evidence that plaintiff suffered from weakness and sensory loss, but rejected that contention in light of the absence of consistent clinical findings, persistent symptomatic complaints, or a diagnosis of peripheral neuropathy.[6]   Thus, he clearly

---

[6] The rejection of those opinions is addressed in connection with plaintiff's second challenge to the Commissioner's decision.

considered whether plaintiff suffered from "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss," one of the criteria of Listing 1.04A, and concluded that he did not.  (Tr. 44.)  Similarly, in his Step 4 analysis, the ALJ explained his rejection of parts of Dr. McNear's MSSs—such as his finding of weakness and sensory loss— because they were not supported by clinical findings or documented subjective complaints in his own treatment notes.  (Tr. 49.)  He further discussed in Step 4 clinical evidence necessarily bearing on whether plaintiff met or exceeded Listing 1.04A, and explained why he gave more or less weight to that evidence.

The ALJ's conclusion that plaintiff did not meet or medically equal Listing 1.04A is also supported by the consistent expert opinions of the state agency reviewing physicians, who relied in great part on the medical findings of state agency consulting physician Dr. Leung.  State agency physician consultants are considered "highly qualified and experts in Social Security disability evaluation."  20 C.F.R. § 404.1513a(b)(1).  A state agency physician's finding that a claimant was not disabled conclusively establishes that the Commissioner has considered the question of medical equivalence, and the agency physician's opinion constitutes substantial evidence upon which an ALJ may rely to find that the claimant does not meet or medically equal a listing.  *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).  Dr. Pardo's conclusion, with which Dr. Aquino agreed, that plaintiff did not meet or equal Listing 1.04, is substantial evidence that supports the ALJ's decision in this regard.

Even if reasonable minds could differ as to whether plaintiff met or equaled Listing 1.04A, ALJ Panek's decision at Step 3 that he did not is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence.

**2.      Medical Opinion of Plaintiff's Treating Physician Dr. McNear**

Plaintiff complains that the ALJ improperly discounted the opinions of Dr. McNear, plaintiff's treating physician.  The Treating Physician Rule, SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996), applies to plaintiff's claim because he filed his claim before March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928297, at *1 (Apr. 6, 2017).  The Treating Physician Rule  provides, "If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted."  SSR 96-2p ¶ 6.  Even if it is not controlling, the ALJ may give the treating doctor's opinion deference and may adopt it.  *Id.* at ¶ 7.  It the ALJ does not give the treating physician's opinion controlling weight, he must give good reasons for doing so after considering factors such as "(1) whether the physician examined the claimant, (2) whether the physician treated the claimant, and if so, the duration of overall treatment and the thoroughness and frequency of examinations, (3) whether other medical evidence supports the physician's opinion, (4) whether the physician's opinion is consistent with the record, and (5) whether the opinion relates to the physician's specialty." *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016); *see* 20 C.F.R. § 404.1527.  In his discussion of the relevant weighing factors, the ALJ need not mention every factor and need only minimally articulate good reasons for his decision, a very lax standard.  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

Plaintiff argues that the ALJ erred in analyzing Dr. McNear's October 4, 2017, MSSs and failed to logically explain the weight he gave to those statements.  Specifically, he argues the ALJ failed to fully credit Dr. McNear's opinions about his "need for help with daily activities, . . . somatic dysfunction, . . . diminished reflexes, posture, spinal stenosis and muscle spasm with demonstrated bilateral spinal compression, pain and spasm."  Pl. Brief at 7 (Doc. 17-1).  Plaintiff

also argues the ALJ ignored evidence favorable to plaintiff such as evidence of nerve impingement and compression in the spine as seen on the MRI, and plaintiff's hearing testimony that he was always in pain and must switch positions constantly.  He also argues the ALJ failed to discuss other relevant factors such as length of the treatment relationship and supportability and consistency with the record.  Ultimately, the ALJ discounted many of the opinions Dr. McNear gave as to the severity of the impact of plaintiff's impairments.

The Commissioner argues that the ALJ properly gave Dr. McNear's opinions controlling weight to the extent they were supported by the record but gave no weight to the extent they were not.  For example, the ALJ credited Dr. McNear's opinion regarding lifting restrictions and diagnoses that were supported by imaging studies of plaintiff's spine, but discredited other assessments that found no support in clinical findings or documented subjective complaints.  The Commissioner argues that the ALJ gave "good reasons" for rejecting those opinions:   Dr. McNear's decision to keep prescribing the same medication even though it caused drowsiness, the lack of medical records between 2000 and 2014 to support Dr. McNear's opinions regarding that period, and office notes reflecting plaintiff's pain level was steady since 2014.  The Commissioner also argues that, contrary to plaintiff's assertion, the ALJ discussed functional  limitations on plaintiff's daily activities that were supported by the record and considered the relevant factors for weighing Dr. McNear's opinions.

ALJ Panek did not violate the Treating Physician Rule by not giving all of Dr. McNear's opinions controlling weight.  A bird's eye view of Dr. McNear's treatment of plaintiff is helpful to put Dr. McNear's opinions in perspective.  He became plaintiff's doctor in 2000, but his clinical notes to support plaintiff's claim for disability benefits began in 2014, just a year before the alleged onset date.  Dr. McNear's clinical notes indicated plaintiff suffered joint pain and stiffness but his

18

"chief complaint" more often than not was his blood pressure.  Those notes also repeatedly indicated plaintiff's pain was controlled and stable on his current pain medication, which he was tolerating and which, with a few exceptions, Dr. McNear did not change.  The notes also reflect that Dr. McNear repeatedly recommended continuing on his current treatment plan.

On October 4, 2017, this changed.  In his MSSs, Dr. McNear continued to recognize some of the conditions mentioned in his previous clinical notes—degenerative disc disease and cervical spinal stenosis—while others appeared for the first time.  Those new opinions are the parts the ALJ discounted.  In fact, in plaintiff's office visit on June 14, 2017, the last before Dr. McNear completed the MSSs on October 4, 2017, Dr. McNear's notes reflect that plaintiff's chief complaint was that he needed a check-up to review lab work; that he was not tolerating Oxycodone; that he suffered pain and stiffness in one or more joints; and suffered sleep disturbances.  (Tr. 395-96.)  Dr. McNear assessed him at that time with benign essential hypertension, hyperglycemia, hypogonadism, localized primary osteoarthritis of thoracic vertebrae, and cervical spinal stenosis; he also noted spondylosis[7] without myelopathy[8] or radiculopathy,[9] thoracic region.  Dr. McNear further advised him to change his pain medication and return if his condition worsened or if new symptoms arose.  (Tr. 397.)  He did not return before Dr. McNear completed the MSSs on October 4, 2017.

The ALJ recognized that Dr. McNear found in his MSSs that plaintiff could only perform

---

[7] Spondylosis is defined as "degenerative spinal changes due to osteoarthritis."  Spondylosis, *Dorland's Medical Dictionary*, https://www.dorlands.com/dorlands/def.jsp?id=100099768 (visited Jan. 22, 2021).
[8] Myelopathy is defined as "any of various functional disturbances or pathological changes in the spinal cord."  Myelopathy, *Dorland's Medical Dictionary*, https://www.dorlands.com/dorlands/def.jsp?id=100069464 (visited Jan. 22, 2021).
[9] Radiculopathy is defined as a "disease of the nerve roots, such as from inflammation or impingement by a tumor or a bony spur."  Radiculopathy, *Dorland's Medical Dictionary*, https://www.dorlands.com/dorlands/def.jsp?id=100089522 (visited Jan. 22, 2021).

19

light work with a 20-pound lifting limit, a restriction he found supported by the earlier imaging studies showing moderate to severe degenerative changes of the cervical spine, mild to moderate disc bulging and facet hypertrophy, and a small central disc protrusion at T7-T8 with mild impingement on the cord centrally.  However, he found the remainder of the MSSs—including Dr. McNear's opinions about new diagnoses, the need to shift positions, how often he would miss work, and how often he would be off-task—were unsupported by clinical findings or documented subjective complaints.  Specifically, he noted that Dr. McNear's treatment notes indicated he did not recommend a new medicine to replace the drowsiness-inducing Percocet, that there were no treatment notes from before July 2014 to support Dr. McNear's opinions during that time period, and that his treatment of plaintiff essentially remained the same since July 2014.  In light of the lack of support for much of Dr. McNear's opinions in his own clinical notes, the ALJ did not have to give controlling weight to his opinions as to unsupported matters.  The ALJ then noted that Nurse Baalman's MSS, although consistent in part with Dr. McNear's, was not supported by any treatment notes or any other records and covered a period, July 2015 to May 2016, in which Nurse Baalman did not see plaintiff.  Finally, the ALJ noted that plaintiff's activities of daily living and Dr. Leung's observation of plaintiff's normal gait did not support Dr. McNear's opinion in his MSSs.

In sum, although ALJ Panek did not specifically mention and explain every relevant consideration regarding his weighing of Dr. McNear's MSSs, he satisfied his duty to minimally articulate good reasons for his decision to discount part of Dr. McNear's opinions.  *See Elder v. Astrue*, 529 F.3d at 415.  Plaintiff has not pointed to any evidence the ALJ failed to consider that would support Dr. McNear's otherwise unsupported opinions about plaintiff's limitations.  This decision was therefore supported by substantial evidence.

### 3.      Plaintiff's Subjective Complaints

Plaintiff charges that the ALJ erred in not completely crediting the plaintiff's statements about the intensity, persistence, and limiting effects of his impairments.  Under the applicable rules, the ALJ follows a two-step process to evaluate a claimant's subjective symptoms.  *See* 20 C.F.R. § 404.1529(a); SSR 16-3p, 2016 WL 1119029, *2 (Mar. 16, 2016).  In the first step, the ALJ considers whether there is objective medical evidence showing an impairment that could reasonably be expected to produce the pain or other symptoms the claimant alleges.  *See* 20 C.F.R. § 404.1529(b).  In the second step, the ALJ considers whether the record as a whole supports the claimed intensity, persistence, and limiting effects of those symptoms.  *See* 20 C.F.R. § 404.1529(c).  In doing so, the ALJ may look to the claimant's reported activities, including from non-medical sources such as family and friends, and the treatment he received and may find the claimant's daily activities demonstrate functioning that suggests the plaintiff is not as limited as his testimony might suggest.  *See Burmester v. Berryhill*, 920 F.3d 507, 510-11 (7th Cir. 2019); 20 C.F.R. § 404.1529(a); SSR 16-3p, 2016 WL 1119029, at *4.

The Court gives "special deference" to the ALJ's conclusion and will "disturb the ALJ's credibility finding only if it is 'patently wrong.'"  *Burmester*, 920 F.3d at 510 (quoting *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015)); *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017).  An assessment of plaintiff's statements is not "patently wrong" if the ALJ offers reasons supported by the evidence.  *Burmester*, 920 F.3d at 511.  However, the ALJ may not ignore evidence that goes against that assessment.  *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020).

ALJ Panek found plaintiff satisfied the first inquiry, but at the second step he found the evidence did not support the limitations plaintiff claimed.  He specifically pointed to the fact that plaintiff's alleged limitations are inconsistent with his mainly conservative treatment history;

normal physical examinations; the lack of any recommendation for less conservative treatment, different medications, or more lab tests; and his daily activities.  The ALJ evaluated plaintiff's symptoms as not as limiting as plaintiff claimed in light of this other evidence in the record.  (Tr. 48-49.)

Plaintiff faults the ALJ with failing to seek additional information, using boilerplate language, and failing to explain which of plaintiff's specific statements were not consistent with the medical evidence.  It is true that the ALJ used some boilerplate language to explain his evaluation of plaintiff's description of the intensity, persistence, and limiting effect of his impairments.  However, boilerplate language is acceptable as long as it is accompanied by an explanation of the ALJ's reasons for discounting plaintiff's subjective complaints. *Burmester*, 920 F.3d at 510.  Additionally, an ALJ is not required to do a "point-by-point credibility assessment" as long as he "consider[ed] the relevant evidence, compare[d] the consistency of [plaintiff's] testimony against the objective record and ground[ed] his credibility finding in the medical evidence." *McCurrie v. Astrue*, 401 F. App'x 145, 149 (7th Cir. 2010).  Finally, to the extent other information was available to present at the hearing, the ALJ could assume the plaintiff's counsel would present the evidence if it existed.  *See Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007) (observing that "a claimant represented by counsel is presumed to have made his best case before the ALJ").  ALJ Panek's inclusion of boilerplate language and failure to analyze plaintiff's statements one at a time did not render his credibility determination "patently wrong."

Plaintiff next claims the ALJ improperly equated his performance of his daily activities and the ability to work a full-time job.  However, he did not make this equivalence; he simply found that plaintiff's daily activities did "not document or support any extreme daily limitations from any of his physical health conditions."  (Tr. 49.)  In other words, the ALJ used plaintiff's

22

daily activities to assess the intensity and persistence of his symptoms, not as a basis for finding he could perform full-time work. *See Burmester*, 920 F.3d at 510.

Plaintiff also faults the ALJ for failing to discuss the side effects of his medication, including that it made him tired and drowsy. The ALJ acknowledged and considered medical records reflecting these side effects, but weighed the fact that, with few exceptions, the side effects were not severe enough for Dr. McNear to change the medication. In fact, most of Dr. McNear's treatment notes indicated plaintiff was tolerating his medications without problems. The few occasions when Dr. McNear did change plaintiff's medication—Toprol and Oxycodone—demonstrates that he would make changes when the side effects were too debilitating. The ALJ gave appropriate consideration to the side effects of plaintiff's medications in light of the medical evidence and assessed the limiting effects of those side effects accordingly.

Plaintiff argues that the ALJ did not adequately consider his obesity and its limiting effects in combination with his other impairments. The ALJ specifically discussed plaintiff's obesity and the absence of any evidence showing the limitations it presented precluded all work activity. The plaintiff has not pointed to any evidence the ALJ failed to consider. *See Hisle v. Astrue*, 258 F. App'x 33, 37 (7th Cir. 2007) (stating "the claimant must articulate how her obesity limits her functioning and exacerbates her impairments"). Furthermore, the ALJ gave partial weight to the opinions of state agency consultants who were aware of plaintiff's severe obesity and factored it into their opinions. *Id.* (finding harmless error where ALJ failed to explicitly address obesity but reviews medical opinions of those familiar with it).

Finally, plaintiff faults the ALJ for failing to discuss how plaintiff's treatment was conservative or the reasons that may have limited him to such treatment. But the ALJ did accurately note that medication and two chiropractic visits were conservative and inconsistent with

23

plaintiff's claimed level of impairment.  *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009).

He further considered that no doctor had ever even recommended less conservative treatment like

injections, pain management treatment, physical therapy, or surgery or had even recommended

further imaging tests that might support such additional treatment.  The absence of any doctor's

recommendation for different testing or treatment moderates any conclusion that there was a good

reason other than his health condition plaintiff did not seek it.  While it is true that after the hearing

in this case, an orthopedic physician recommended surgery, that recommendation came in August

2018, after the ALJ's decision in this case and more than three years after the alleged onset date

of July 2015, so it sheds little light on plaintiff's condition during the relevant period.

Consequently, the Appeals Council found consideration of that evidence did not have a reasonable

probability of changing the ALJ's decision.

 In sum, plaintiff has not pointed to any evidence the ALJ ignored, any inadequacy of the

ALJ's explanation, or any conclusion that lacked substantial supporting evidence.  The Court

cannot find the ALJ's evaluation of plaintiff's symptoms is patently wrong.

 **4. Grid Rule 202.06**

 Plaintiff asserts that the ALJ erred in failing to apply Grid Rule 202.06 at Step 5.  In the

Social Security context, the term "grid" refers to the Medical-Vocational Guidelines in Appendix

2 to 20 C.F.R. Part 404, Subpart P.  Appendix 2 contains numerous tables—thus, "grids"—

applicable to different RFCs that have columns representing the claimant's age, education,

previous work experience, and disability decision.  The tables are used in cases that cannot be

evaluated on medical considerations alone where a claimant satisfies Steps 1, 2, and 4 of the 5-

step inquiry.  Where the factual findings satisfy each criterion of a rule, the rule directs the outcome

of the disability decision.  If the facts do not satisfy each criteria, the rule does not apply, but the

rule may still provide guidance or a framework.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a) & (c).  The tables take administrative notice of and incorporate the numbers of unskilled jobs in the national economy at the various functional levels as determined by various occupational data resources.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(b).

Application of the tables depends somewhat on the nature of the claimant's impairments because "the rules are predicated on an individual's having an impairment which manifests itself by limitations in meeting the strength requirements of jobs. . . ."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e).  Thus, where impairments also pose nonexertional limitations,[10] the tables may not be determinative but should be considered.  *Id.*  When the claimant has only nonexertional limitations, relying on the grids is improper.  *Fast v. Barnhart*, 397 F.3d 468, 471 (7th Cir. 2005).

For example, Table No. 2 is called "Residual Functional Capacity: Maximum Sustained Work Capability Limited to Light Work as a Result of Severe Medically Determinable Impairment(s)," meaning it applies to claimants capable of doing a full range of light work.  Each row in the table represents a rule; Rule 202.06 provides:

| Rule | Age | Education | Previous work experience | Decision |
|------|-----|-----------|--------------------------|----------|
| 202.06 | Advanced age | High school graduate or more– does not provide for direct entry into skilled work. | Skilled or semiskilled– skills not transferable. | Disabled |

20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.00, Table No. 2.  Therefore, under Rule 202.06, a claimant with exertional limitations who is at least 55 years old, who has at least a high school

---

[10] Exertional activities "consist of three work positions (standing, walking, and sitting) and four worker movements of objects (lifting, carrying, pushing, and pulling)."  SSR 83-14, 1983 WL 31254, at *1 (Jan. 1, 1983).  Limitations in other areas are considered "nonexertional."  *Id.*  Nonexertional restrictions include limitations on "climbing or balancing; stooping, kneeling, crouching or crawling; reaching, handling, fingering, or feeling; talking or hearing; and seeing," as well as limitations on environmental conditions and job complexity.  *Id.*

education that does not provide direct entry into skilled work, and whose previous work was skilled or semiskilled but the skills are not transferrable should be found disabled.

Plaintiff points out that he was 50 years old at the time of his onset, was limited to light, unskilled work, and had a GED but no transferrable job skills.  In his estimation, this mandated a finding of "disabled" under Grid Rule 202.06.  The Commissioner argues that Grid Rule 202.06 does not apply to plaintiff because he had not reached 55 years old at any time during the decision process.

Grid Rule 202.06 did not apply to plaintiff because he was not of "advanced age."  Instead, the ALJ acknowledged Grid Rule 202.14, the rule applicable to those "closely approaching advanced age"—that is, 50 to 54 years old, 20 C.F.R. § 404.1563(d)—who can perform the full range of light work.  However, he did not rely on that rule because plaintiff was not able to do a full range of light work; his abilities were impeded by additional nonexertional limitations.  Instead, the ALJ appropriately considered Grid Rule 202.14 in addition to the VE's testimony to arrive at his final conclusion that plaintiff was not disabled.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); SSR 83-14, 1983 WL 31254 (Jan. 1, 1983).  (Tr. 50-51.)  The ALJ made no error of law in failing to apply Grid Rule 202.06.

### 5.    Conflicts Between VE's Testimony and Dictionary of Occupational Titles

Plaintiff faults the ALJ for failing to identify, obtain a reasonable explanation for, and resolve a conflict between the VE's testimony and the DOT as required by SSR 00-4P, 2000 WL 1898704, at *1 (Dec. 4, 2000).  That ruling says,

> When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. . . .   The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information.

26

SSR 00-4P, 2000 WL 1898704, at *2 (Dec. 4, 2000).  The ALJ must ask at the hearing whether there is an inconsistency.  *Id.*

The plaintiff asserts that the three jobs identified as existing in significant numbers in the national economy that plaintiff could perform— counter clerk (photofinishing)[11] (18,625 jobs), furniture rental clerk (18,625 jobs), and usher (23,580 jobs) (Tr. 88.)—do not actually exist as full-time jobs in those numbers, and many do not qualify as substantial gainful activity.  He further asserts that these jobs actually require frequent use of the upper extremities to reach, grasp, handle, finger, and other nonexertional tasks plaintiff cannot perform.  He also questions whether the VE's numbers come from the DOT and suggests the DOT is obsolete.

Plaintiff has pointed to nothing in the VE's testimony about these jobs that appears to be in conflict with the DOT.  He suggests the ALJ should have been suspicious about the exact same number of available jobs for the first two job types and that the ALJ should have known the jobs exceeded plaintiff's limitations.   However, the ALJ asked the VE to notify him of any inconsistencies between her testimony and the DOT, and she did not identify any conflict.  Beyond that, plaintiff's theory that a conflict was apparent and needed to be resolved by the ALJ is speculative.  Now he asks the Court to reweigh the VE's testimony and come to a different conclusion about the named jobs and the number of those jobs that exist, but that is not this Court's task.  *See Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

Plaintiff also faults the ALJ for failing to inquire into the underlying data supporting the VE's opinion testimony.  However, an ALJ does not have to inquire into the underlying data before he can give weight to a VE's testimony, and a VE's testimony can provide substantial evidence to

---

[11] The VE did not specify the counter clerk as associated with photofinishing, but the number she gave, DOT 249.366-010, corresponds to that precise kind of counter clerk.

support a disability finding at Step 5 even without disclosure of that data. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154-55 (2019) (noting no requirement that a VE produce all data underlying her opinion). A VE's testimony can be "substantial evidence," that is, the kind of evidence that "a reasonable mind might accept as adequate to support a conclusion" even without the disclosure of supporting data. *Id.* at 1154 (internal quotations omitted). The failure of a VE to provide supporting evidence may be a factor for the ALJ to consider in weighing her testimony—especially if the VE refuses to answer claimant's counsel's reasonable questions regarding the opinion's foundation—but it will not prevent her testimony from constituting substantial evidence in support of the ALJ's findings. *See id.* at 1556. Here, plaintiff's counsel did not question the VE's testimony at the hearing.

Plaintiff also challenges whether 60,830[12] jobs, the total of the three categories, constitutes a "significant number" of jobs in the United States. Caselaw supports that jobs existing in far fewer numbers are considered as a matter of law to exist in significant numbers in the national economy. *See Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (collecting cases in support of proposition that 1,000 cases is a "significant number"). The ALJ made no legal error in his assessment.[13]

In sum, the VE's testimony was not so flawed or apparently in conflict with the DOT that the ALJ should have made further inquiries or rejected it as substantial evidence in support of his decision. Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (quoting

---

[12] The plaintiff erroneously tallies the jobs as 120,350.

[13] Even if the Court accepts the plaintiff's assertion that far fewer than 60,830 full-time jobs actually exist that plaintiff could perform with his exertional and nonexertional restrictions, nothing suggests that the real number of those jobs would dive below the threshold for a "significant number."

*Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  There is nothing about the VE's testimony that a reasonable mind could not accept in support of ALJ Panek's findings at Step 5.

### Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Panek committed no errors of law and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's applications for disability benefits and a period of disability is **AFFIRMED**.

The Clerk of Court is **DIRECTED** to enter judgment in favor of defendant.

**IT IS SO ORDERED.**
**DATED:  March 17, 2021**

s/ J. Phil Gilbert_____
**J. PHIL GILBERT**
**DISTRICT JUDGE**